IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| NAVAGIUM VECTORIUM, LLC, a California limited liability company; OUTFITTER ROTARY LLC, a Delaware limited liability company; and OUTFITTER AVIATION, LLC, a Delaware limited liability company;<br><br>              Plaintiffs;<br><br>     v.<br><br>ROGER SUTTON and OUTFITTER AVIATION OREGON, LLC, an Oregon limited liability company;<br><br>              Defendants. | Case No. 1:13-cv-00162-CL<br><br>**ORDER** |
| HADLEY & PECH, INC, a Nevada corporation,<br><br>              Joined Counterclaim Plaintiff,<br><br>     v.<br><br>OUTFITTER AVIATION, LLC, a Delaware limited liability company,<br><br>              Counterclaim Defendant. | |

/ / /

CLARKE, Magistrate Judge.

This case involves three aircraft owned by Plaintiffs[1] and managed by Defendants[2]: a Dassault Falcon 900 ("Falcon"); a Beechcraft Bonanza ("Bonanza"); and a Cirrus SR22 ("Cirrus"). Plaintiffs allege Defendants mismanaged the planes. Defendants deny any mismanagement and countersue for unpaid fees and expenses.

The Court held a bench trial on August 25, 2015. Having weighed, evaluated, and considered the evidence presented at trial, I hereby make the following findings of fact and conclusions of law. FED. R. CIV. P. 52(a).

## FINDINGS OF FACT[3]

### I. The Falcon

In 2000, Plaintiffs contracted with Defendants to manage their newly acquired Falcon, a luxury jet. Defendants agreed, among other things, to perform "all functions necessary for the operation, maintenance[,] and administration of the Aircraft[.]" Pls.' Ex. 1A, at 1. Defendant Roger Sutton ("Sutton") testified that he was expected to keep the plane airworthy and fly the plane on a moment's notice.

*A. Plaintiffs' Refundable Deposit*

Near the beginning of the parties' relationship, Plaintiffs paid a $50,000 refundable deposit to Defendants as required by Schedule A of the Falcon agreement. Pls.' Ex. 1A, at 23. Schedule A provided: "[u]pon any termination of this agreement for any reason, [Defendants] shall promptly refund the entire deposit to [Plaintiffs], less the amount of any properly payable

---

[1] For ease of reference, I will refer to the parties collectively as "Plaintiffs" and "Defendants."
[2] At trial, I granted Plaintiffs' motion to add Hadley & Pech, Inc. as a Defendant. The parties agreed to this addition despite the fact that Hadley & Pech is defunct. At a status conference after the trial, the parties represented that they would work together to resolve any issues that might arise from judgments granted for and/or against the defunct entity. Accordingly, I will refrain from analyzing the possible effects of Hadley & Pech's status in this order. If the parties are not able to resolve this issue, I will do so at entry of judgment.
[3] To the extent a finding of fact would more properly be characterized as a conclusion of law, it should be so construed. Likewise, to the extent a conclusion of law should be deemed a finding of fact, it shall be treated as such.

invoices to unrelated third parties." Pls.' Ex. 1A, at 23. Although the parties' agreement is now terminated, the corporate representative of the Plaintiff entities, Lilli Rey ("Rey"), testified Defendants never refunded the deposit to Plaintiffs or provided an accounting for it. Sutton testified to his belief that his late business partner handled the refund; however, he has no documentation to that effect.

### B. *The Sale of the Falcon*

In 2009, Rey and Val Vaden, joint owners of the Plaintiff entities, began to dissolve their marriage. Their divorce coincided with difficult financial times. Plaintiffs' use of the Falcon declined and they began to fall behind in their payments to Sutton. To mitigate their losses, Plaintiffs opted to sell the jet. They retained a broker who secured a buyer.

On March 4, 2011, Plaintiffs entered into an agreement with the buyer to sell the Falcon for $6,600,000. Pls.' Ex. 8, at 2. Sometime in late February or early March, Sutton delivered the Falcon to a facility in Illinois for a pre-sale inspection. Sutton remained in Illinois for a period of time in case his presence or input was needed. He then returned to Medford where he remained available to answer questions and pass along requested records. Plaintiffs did not notify Sutton of any intent to terminate his services as required by the management contract. Pls.' Ex. 1A, at 15. Thus, although the Falcon was out of his possession, Sutton remained obligated under the contract. Sutton testified that he refrained from pursuing other clients to ensure he would be available to honor his commitments to Plaintiffs in the event that the sale did not go through.

Defendants were contractually obligated to maintain the Falcon in compliance with manufacturers' specifications and applicable Federal Aviation Regulations (FAR), and to keep "complete, accurate and timely logs, books and records ... pertaining to the Aircraft[.]" Pls.' Ex. 1A, at 6-8. Inspectors at the facility in Illinois identified hundreds of discrepancies in the plane's

records. Noted problems included "no maintenance release tag" for various items; forms not on file with the FAA; and missing signed task forms. Pls.' Ex. 11, at 1, 22, 35. Defendants concede their error in misplacing four or five documents. However, Defendants dispute whether the majority of the records deemed to be nonconforming were even required by applicable FAR and manufacturers' recommendations. Specifically, the general manager of the Medford jet center, Gary Hudnall ("Hudnall"), testified a person could record maintenance work with a release tag but that tags are not the only valid means of doing so. There is no regulatory requirement for release tags. Hudnall and Sutton testified that Defendants met their obligations by documenting maintenance and inspections in the log as well as a computerized tracking system.

Under the management contract, Defendants were obligated to timely obtain and renew all licenses and registrations necessary for the Falcon's operation. Pls.' Ex. 1A, at 5. On July 5, 2011, Sutton notified Plaintiffs that the Falcon's FAA registration had lapsed as of June 30, 2011. He explained that the aircraft needed to be reregistered, and that Plaintiffs could retain their current registration number if they applied within 60 days.

Rey testified that the lapse in registration delayed Plaintiffs' ability to complete a post-inspection fly-off for the buyer. I find Rey to be a credible witness. However, I note that she was not directly involved in the Falcon's sale and did not communicate with Sutton or the buyer during the process. Sutton testified to two facts that mitigated his mistake's effect on Plaintiffs' sale of the Falcon. First, although re-registration takes longer than renewal, a person can acquire a pink slip to operate an aircraft during the process. Second, it is common practice for a buyer to re-register an aircraft after closing. Hudnall similarly testified that planes are typically re-registered after transfer. I find the testimony of Sutton and Hudnall to be credible.

Plaintiffs and the buyer amended their sales agreement. Plaintiffs approved a reduced price of $6,279,000 and the buyer accepted the Falcon "in an 'as-is, where-is' condition and without any Acceptance Flight[.]" Pls.' Ex. 9, at 1. The sale closed in late July 2011. Pls.' Ex. 10. No one who personally participated in the Falcon's negotiations testified at trial. It is not clear why or how Plaintiffs and the buyer arrived upon this reduced amount.

The parties' contract provided Plaintiffs would timely reimburse Defendants for costs incurred in connection with the Falcon's operation and maintenance. It also obligated Plaintiffs to pay a management fee which Defendants assert, and Plaintiffs do not dispute, was set at $37,000 a month in 2011. Pls.' Ex. 1A, at 11-12. Defendants billed Plaintiffs $7,460.27 for aircraft usage and crew expenses incurred on his trip to the inspection facility in Illinois. Pls.' Ex. 17. The sale's closing statement shows the same amount was dispersed to Defendants. Pls.' Ex. 10. Defendants separately billed $7,129.75 to Plaintiffs for jet fuel. Defs.' Ex. 104, at 6. The sale's closing document lists $7,129 in fuel reimbursement paid by the buyer to Plaintiffs. Pls.' Ex. 10. Sutton testified that Plaintiffs never passed the funds along to him although he was the one who incurred them. Plaintiffs present no evidence or testimony to dispute the validity of Defendants' claim for compensation or to indicate that they previously paid Defendants for the fuel. Defendants also billed Plaintiffs for management fees from February through July 2011, totaling $222,000. Pls.' Ex. 16, at 1-2.

### C. *Plaintiffs' Double Payment of Two Invoices*

In November 2011, Melissa Findley, Plaintiffs' bookkeeper, contacted Sutton about two invoices that Plaintiffs mistakenly double-paid in the prior year: one for $13,579.72 and the other for $15,481.73. Pls.' Ex. 14, at 1, 2, 8. She requested a refund of $29,061.45. Pls.' Ex. 14, at 1.

Findley testified that she never received a response or refund. Sutton testified that he has no idea whether Plaintiffs were reimbursed.

## II. The Bonanza

In 2000 or 2001, the parties entered into a verbal agreement that Defendants would manage the Bonanza, a small passenger aircraft, to support the Falcon's operations. In September 2011, Plaintiffs notified Defendants that they had engaged a broker to list the Bonanza for sale. Defs.' Ex. 115, at 2. They asked Defendants to send the aircraft to California. Defs.' Ex. 115, at 2. Defendants refused, claiming a chattel lien on the Bonanza in connection with unpaid invoices. Defs.' Ex. 115, at 1.

In an invoice dated October 6, 2011, Defendants billed $32,146.50 to Plaintiffs for maintenance, labor, inspections, insurance, hangar rent, fuel, and a 15 percent administrative fee. Defs.' Ex. 117, at 1. The parties never agreed on a 15 percent administrative fee. Rather, Sutton tacked it on because he was not otherwise charging Plaintiffs a management fee for the Bonanza. Defendants present no evidence to show how Sutton arrived upon 15 percent or what the figure was intended to compensate. In 2013, Defendants billed $9,667[4] to Plaintiffs for hanger rent due from November 2011 through December 2013. Defs.' Ex. 119, at 1-3. Defendants provided supporting documentation for some of the charges included in the 2011 and 2013 invoices. Defs.' Ex. 117-19. Sutton testified at trial to the accuracy of the others.

In the invoices, Defendants charged Plaintiffs a flat hanger rent rate of $350 per month. Defs.' Ex. 117, at 1; Ex. 119, at 1-3. Supporting bills show Sutton paid Jackson County Airport Authority $285.58 to $305.72 per month for the Bonanza's hanger space. Defs.' Ex. 118. Sutton testified that he rounded up the rate charged to Plaintiffs to account for late fees commonly

---

[4] This is total charge is comprised of an invoice for $6,867 dated April 23, 2013, an invoice for $1,750 dated August 16, 2013, and an invoice for $1,050 dated November 25, 2013.

Page 6 – ORDER

incurred. Sutton often paid rent after the due date and Jackson County Airport Authority charged him late fees of $7 to $8. Defs. Ex. 118, at 1, 20, 84, 85. Plaintiffs do not dispute that they owe Defendants money related to the Bonanza. Rather, Rey testified that Defendants have not provided adequate support for their charges.

On July 3, 2014, the Court ordered (#71) Defendants to release the Bonanza to Plaintiffs upon Plaintiffs' posting of a $34,000 bond with the Court. Plaintiffs posted (#74) the required bond on July 24, 2014. Defendants subsequently released the Bonanza. They now seek compensation for hanger rent through August 2014.

### III. The Cirrus

In 2009, the parties entered into a verbal agreement that Defendants would manage Plaintiffs' Cirrus. By October of that year, Plaintiffs were past due in their payments to Defendants. Defs.' Ex. 107. Plaintiffs instructed Sutton to sell the Cirrus and apply the proceeds to Plaintiffs' delinquent account. Defs.' Ex. 107. Sutton retained a broker who located a buyer, Stan Leigh Investments ("SLI"). Sutton negotiated the sale of the Cirrus on Plaintiffs' behalf.

The sale was memorialized in a contract between Plaintiffs and SLI dated January 25, 2010. Pls.' Ex. 2. In pertinent part, the contract provided:

> 4.1 The buyer will also wire a deposit of $4,000 directly to the seller for the movement of the airplane to the buyer's location, the Stuart Airport in Florida, prior to the aircraft departing. ... It is agreed that the seller will move the aircraft to the buyer's airport after closing on or before February 8th, 2010 with the expectation of weather or circumstances beyond the pilot's control. ...
> 6 ... It is agreed that the delivery location will be at the [Rogue Valley-Medford International Airport] airport. ... Title and risk of loss or damage to the Aircraft shall pass to Buyer at the time of delivery. ...

Pls.' Ex. 2, at 2.

Sutton received the sale's proceeds as well as $4,000 to ferry the Cirrus to Florida. Sutton testified that he negotiated the plane's delivery separate from the sale. As such, he did not list the $4,000 in his accounting of the sale proceeds to Plaintiffs. Defs.' Ex. 110. In a response to interrogatories, Plaintiffs identified SLI as the person/entity who contracted with Sutton to deliver the Cirrus. Defs.' Ex. 120, at 4. Rey testified that she did not communicate with Sutton about moving the aircraft the Florida.

Plaintiffs canceled their insurance policy on the Cirrus, effective February 3, 2010. Defs.' Ex. 122, at 3. SLI purchased insurance for the aircraft, effective February 3, 2010. Defs.' Ex. 111. Sutton testified that he refrained from flying the Cirrus to Florida until he received confirmation that SLI's insurance policy was in effect. On February 6, 2010, Sutton and a passenger became ill in transit. Sutton attempted an emergency landing in windy conditions. Sutton lost control of the plane, and it was destroyed. Pls.' Ex. 3B, at 1. The National Transportation Safety Board investigated the crash and concluded it was caused by pilot error. Pls.' Ex. 3B, at 10.

Plaintiffs did not learn of the crash until SLI filed suit against them and Defendants in July 2010, seeking damages for the Cirrus. Defs.' Ex. 113. Plaintiffs incurred $117,758 in costs and attorney's fees defending that litigation. Joint Statement of Stipulated Facts ¶ 7; Pls.' Ex 7. Sutton testified that he paid his own lawyer about $25,000. Ultimately, SLI's insurance company covered the loss and Sutton received a payout. The suit was dismissed on June 13, 2011. Defs.' Ex. 114.

/ / /

/ / /

/ / /

# CONCLUSIONS OF LAW

## II. The Falcon

Plaintiffs bring three claims related to the Falcon: a breach of contract claim related to their refundable deposit, a breach of contract claim for recovery of the plane's reduction in sale price, and a claim for reimbursement of overpayments. Defendants countersue for payment of travel expenses incurred transporting the Falcon to Illinois as well as multiple months of management fees.

### A. Plaintiffs' Breach of Contract Claim for the Refundable Deposit

To prevail in a breach of contract under Oregon law, a plaintiff must prove by a preponderance of the evidence: (1) the existence of a contract, (2) the relevant terms of the contract, (3) the plaintiff's full performance and lack of breach, and (4) the defendant's breach resulting in damage to the plaintiff. *Slover v. Oregon State Bd. of Clinical Soc. Workers,* 144 Or.App. 565, 570 (1996); *W.D. Miller Const. Co. v. Donald M. Drake Co.,* 221 Or. 249, 270 (1960). Plaintiffs met their burden on all four elements for their claim related to the Falcon's refundable deposit. They paid $50,000 to Defendants pursuant to Schedule A of the Falcon's management agreement. The contract provided that Defendants would promptly refund the deposit upon termination of the agreement. Plaintiffs never received a refund or accounting. Accordingly, I find that Defendants breached Schedule A of the contract resulting in $50,000 in damages to Plaintiffs.

### B. Plaintiffs' Breach of Contract Claim for the Reduction in Sale Price

It is well settled that "proof of damages is an essential element of a breach of contract action." *Rizo v. U–Lane–O Credit Union,* 178 Or.App. 498, 501 (2001). In *Rizio*, the Oregon Court of Appeals upheld a trial court's rejection of a plaintiff's breach of contract claim "because

the alleged damages were not caused by the alleged breach." *Id.* at 502. The court did not even reach the underlying question of whether the defendant breached the agreement. *Id.* at 501.

Similarly, Plaintiffs have failed to produce evidence that they suffered economic damages as a result of Defendants' alleged mismanagement of the Falcon, its records, and/or its registration. As noted in the findings of fact above, Defendants deviated from their contractual obligations by failing to keep all required records and allowing the Falcon's registration to lapse. Plaintiffs initially secured a $6,600,000 sales agreement for the Falcon. However, Plaintiffs later modified the agreement to allow for an "as is" transaction with a $321,000 reduction in price. What is missing from Plaintiffs' showing is a causal link between Defendants' infractions and the steep reduction in the plane's sales price. There is no evidence indicating the registration, repair, or record issues diminished the value of the plane by $321,000. Nor is there testimony from persons involved in the sale that Plaintiffs discounted the plane because of the log book omissions, the gap in registration, and/or the plane's condition.

This is not to say that Defendants' actions or inaction could not have negatively impacted Plaintiffs' position in negotiations with the buyer. Indeed, the evidence shows that the lapse in registration delayed the sale — though the extent of that interruption is not clear. However, it is incumbent upon Plaintiffs to produce specific evidence that Defendants alleged breach caused their alleged damages. *See Dynagraphics, Inc. v. U.S. National Bank of Oregon,* 100 Or.App. 108, 112-13 (1990) (damages must be caused in fact by breach and must be foreseeable, that is, either arise naturally from the breach or have been within the contemplation of the parties at the time they made the contract). Plaintiffs have not met their burden in doing so. They have not proven by a preponderance of the evidence that their claimed damages flowed from Defendants' alleged breach. *White v. Bello,* 276 Or. 931, 936 (1976) ("Plaintiffs had the burden of proving

this allegation, that is to say, they had the burden of proving by a preponderance of the evidence that the damage they claim proximately resulted from defendants' breach of their agreement[.]"). As such, I find in Defendants' favor on this claim.

### C. *Plaintiffs' Claim for Reimbursement of Double Payment on Invoices*

Testimony and documentary evidence establishes that Plaintiffs mistakenly paid two invoices twice, and Defendants did not return their overpayment of $29,061.45. To correct the error, I find that Defendants owe Plaintiffs the overpayment.

### D. *Defendants' Counterclaim for Management Fees and Travel Expenses*

Defendants countersue for management fees from February 2011, when Sutton delivered the plane to the pre-sale inspection facility, to July 2011, when Plaintiffs sold the plane. The first two elements of their breach of contract claim are easily satisfied: (1) the parties had a contract (2) which specifically provided Plaintiffs would pay Defendants a management fee. *Slover*, 144 Or.App. at 570. As for the third element, "[i]t is well established, at least as a general rule, that a plaintiff who seeks to recover under the terms of an express contract for defendant's failure to perform its terms must ... prove his own substantial performance or a valid excuse for his failure to perform." *Iron Horse Eng'g Co., Inc. v. Northwest Rubber Extruders, Inc.*, 193 Or.App. 402, 416 (2004) (quoting *Wasserburger v. American Sci. Chem.*, 267 Or. 77, 82 (1973)). Defendants have done just that. Though they made some minor blunders — allowing the plane's registration to lapse and misplacing some documents — Defendants substantially fulfilled their duties under the Falcon agreement. During the time period in question, Sutton remained available to answer questions posed by inspectors and refrained from pursuing other work in case the sale did not go through. Finally, the evidence shows Plaintiffs breached the contract by failing to pay Defendants' management fees. *Slover*, 144 Or.App. at 570. Plaintiffs dispute whether the

contract was still operative at the time since the plane was in Illinois rather than in Defendants' possession. However, the plane's location was not relevant to the contract's lifespan. The contract provided it would terminate upon notice from Plaintiffs, which they failed to give. Accordingly, I find by a preponderance of the evidence that Plaintiffs breached their obligation to pay management fees for February through July 2011 and now owe Defendants those fees.

Defendants also bring a breach of contract claim to recoup expenses incurred delivering the Falcon to Illinois. Again, there is no dispute that Plaintiffs contractually agreed to reimburse Defendants for costs incurred in connection with the Falcon, including pilot trip expenses. Pls.' Ex. 1A, at 11. Defendants substantially performed their duties under the contract. Defendants incurred $14,590.02 transporting the Falcon to Illinois. At closing, Defendants received $7,460.27 for aircraft usage and crew expenses. However, the preponderance of the evidence shows Plaintiffs did not reimburse Defendants for the $7,129.75 spent on fuel. I find Plaintiffs owe Defendants $7,129.75.

## III. The Bonanza

In regards to the Bonanza, Plaintiffs bring a conversion claim and Defendants counter with a claim for unpaid invoices.

### A. Plaintiffs' Conversion Claim

Defendants returned the Bonanza to Plaintiffs after Plaintiffs posted a bond with the Court. Accordingly, Defendants did not interfere with Plaintiffs' right to control the aircraft in a manner that justifies requiring Defendants to pay its full value. *Emmert v. No Problem Harry, Inc.*, 222 Or.App. 151, 159-60 (2008). Plaintiffs' conversion claim is moot.

/ / /

/ / /

## B. Defendants' Counterclaim for Payment

Defendants seek $45,945.42 for services rendered and costs incurred for the Bonanza. Defs.' Br., at 20. Specifically, they claim they are due $21,000 for 60 months of hanger rent ($350 a month from September 2009 to August 2014), $7,220 for aircraft insurance, $10,232.48 for annual inspections, and $1,500 in fuel, plus a $5,992.88 administrative fee representing 15 percent of the expenses detailed above. Plaintiffs do not dispute that they owe Defendants money. Rather, Rey testified she has refrained from reimbursing Defendants because Defendants have not provided external support for all of the charges claimed. Based on Defendants' exhibits and Sutton's testimony endorsing the accuracy of his invoices, I conclude Defendants are due $36,712.48[5] for this claim. This amount includes the following two deductions:

- The hanger rental rate charged to Plaintiffs does not equal the rate paid by Defendants. There is no evidence that Plaintiffs agreed to pay a higher rate. The fact that Defendants delayed in their own payments and incurred $7 to $8 late fees does not justify the disparity. To more accurately represent costs incurred, I reduce Plaintiffs' monthly hangar rental rate from $350 to $296.[6] This results in an overall reduction of $3,240.

- Because there is no evidence that Plaintiffs agreed to pay a 15 percent administration fee or that the fee would rightly reimburse Defendants for expenses reasonably incurred, I remove it from Defendants' award. Defs.' Ex. 117, at 1.

## IV. The Cirrus

Plaintiffs incurred $117,758 in attorney's fees defending the suit brought by SLI related to the Cirrus crash. They seek to recover this sum from Defendants. Under the so-called American rule, a party generally "cannot recover attorney fees unless there is a statute or a

---

[5] $17,760 for hanger rent (60 months at $296) + $7,220 for aircraft insurance + $10,232.48 for annual inspections + $1,500 for fuel.
[6] The average of the lowest rate paid ($285.58) and the highest rate paid ($305.72 rate) is $295.65.

Page 13 – ORDER

contract that authorizes recovery of those fees." *Peace River Seed Co–Op, Ltd. v. Proseeds Marketing, Inc.*, 355 Or. 44, 65 (2014). In *Huffstutter v. Lind*, 250 Or. 295, 301 (1968), the Oregon Supreme Court recognized an exception to the rule where attorney's fees are claimed as consequential damages. Specifically, the court held "attorney fees are generally allowable as damages in an action against a defendant where the defendant's tortious or wrongful conduct involved the plaintiff in prior litigation with a third party." *Id.* Here, Plaintiffs assert a contractual basis for recovery of the costs of litigation with SLI. Alternatively, they invoke *Huffstutter*'s third party litigation exception to the American rule. I consider each basis for recovery in turn.

### A. Plaintiff's Breach of Contract Claim for Litigation Costs

Under Oregon, law, a plaintiff in a breach of contract action "has the burden to establish the existence of a valid contract and the breach thereof." *Pendleton Grain Growers v. Pedro*, 271 Or. 24, 28 (1975). Here, Plaintiffs cite to their sales contract with SLI as evidence of an agreement between Plaintiffs and Sutton to ferry the Cirrus to Florida. The contract obligated Plaintiffs to move the aircraft to SLI's location. Since Sutton negotiated the sales contract on Plaintiffs' behalf and ultimately undertook the task of moving the plane, Plaintiffs argue Defendants must have done so for them. However, Plaintiffs do not present any testimony or evidence to establish that they asked Defendants to carry out the term on their behalf or that Defendants agreed to do so.

Defendants respond with evidence that, in reality, the Cirrus' delivery did not conform to the sales contract. Sutton testified that he independently contracted with SLI to ferry the plane and waited until SLI's insurance took effect to begin the trip. Plaintiffs bolstered Sutton's testimony by identifying SLI, not themselves, as the party who contracted with Sutton to deliver the aircraft. Because there is no evidence that the referenced sales contract provision was acted

upon and, instead, testimony indicates that Sutton acted independent of Plaintiffs when he ferried the plane, I find that Plaintiffs have not met their burden to establish the existence of a valid contract between Plaintiffs and Defendants related to the Cirrus' transport. As such, Plaintiffs contractual claim for attorney's fees fails.

### B. Plaintiffs' Negligence Claim

It is a fundamental rule of tort law that all persons may be held liable for conduct that creates a foreseeable and unreasonable risk of harm to others and causes injury. *Harris v. Suniga*, 344 Or. 301, 306 (2008). Oregon recognizes an exception to that rule for claims related to strictly economic losses. *Id.* The economic loss doctrine holds that "one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Hale v. Groce*, 304 Or. 281, 284 (1987). Because Plaintiffs' alleged damages are only monetary — $117,758 in attorney's fees and costs — the economic loss doctrine is implicated by their negligence claim.

For a plaintiff to recover in a negligence action based purely on economic loss, she must "show some source of duty outside the common law of negligence, such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." *Harris*, 344 Or. at 308 (citations and quotation marks omitted). As a pertinent example, Oregon courts have categorized principle-agent relationships as "special" for the purposes of the economic loss doctrine. *Abraham v. T. Henry Const., Inc.*, 230 Or.App. 564, 570 (2009), *aff'd on other grounds*, 350 Or. 29 (2011). In doing so they have cautioned that whether a relationship qualifies as "special" is a functional, not formal, inquiry. *Id.* at 571. "[T]he crucial aspect of the relationship is not its name, but the roles that the parties assume in the particular interaction where the alleged tort and breach of contract occur." *Strader v. Grange Mutual Ins. Co.*, 179

Or.App. 329, 334 (2002), *rev. den.*, 334 Or. 190 (2002). The key is whether the defendant acted, at least in part, to further the economic interests of the other party. *Conway v. Pacific Univ.*, 324 Or. 231, 236 (1996).

It is undisputed that Sutton acted as Plaintiffs' agent in the Cirrus' sale and thus owed Plaintiffs a heighted duty of care during that transaction. *Loosli v. City of Salem*, 215 Or.App. 502, 510 n.3 (2007), *aff'd*, 345 Or. 303 (2008) ("In a principal-agent relationship ... there is a heightened duty on the part of and an entrustment of responsibility to the actor ... to exercise independent judgment on the principal's ... behalf to achieve a desired outcome or resolution."). However, Plaintiffs have failed to prove by a preponderance of the evidence that Defendants owed them any "special" obligations in relation to "the particular interaction where the alleged tort ... occur[ed]": the plane's transportation. *Strader*, 179 Or.App. at 334. Though the sales contract between SLI and Plaintiffs creates some confusion regarding Plaintiffs' role in the Cirrus' flight, the evidence before the Court establishes that Sutton undertook delivery independent from Plaintiffs. Accordingly, I find that Sutton did not owe Plaintiffs a special duty when he flew the plane and thus that Oregon's economic loss doctrine bars Plaintiffs' negligence claim.

Moreover, even assuming Defendants owed Plaintiffs a heightened duty to ferry the Cirrus to its buyer, Plaintiffs have failed to establish that Sutton acted negligently in doing so. The law presumes the exercise of due care, and a plaintiff must prove by a preponderance of the evidence that a defendant deviated from this standard. *Simpson v. Hillman,* 163 Or. 357, 363 (1940). "A person is negligent if the person fails to exercise reasonable care, a standard that 'is measured by what a reasonable person of ordinary prudence would, or would not, do in the same or similar circumstances.'" *Bjorndal v. Weitman*, 344 Or. 470, 478 (2008) (quoting *Woolston v.*

*Wells*, 297 Or. 548, 557 (1984)). To meet this burden, Plaintiffs submit an investigatory report concluding the cause of the crash was pilot error. Alone, I find this report insufficient to establish that Sutton failed to exercise reasonable care in attempting to land the Cirrus.

## V. Prejudgment Interest

In this diversity action, Oregon law determines the rate and availability of prejudgment interest. *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1107 (9th Cir. 1998). Oregon courts award prejudgment interest at 9 percent per year on "[a]ll moneys after they become due[.]" Or. Rev. Stat. § 82.010(1)(a). This is because "[o]nce due, the debtor has the use of money to which the debtor is not entitled, while the delay in payment deprives the creditor of that use." *Strawn v. Farmers Ins. Co. of Or.*, 353 Or. 210, 241 (2013). An award is statutorily required where the exact amount due, and the time from which interest should run, is either ascertained or easily ascertainable. *Farhang v. Kariminaser*, 230 Or.App. 554, 556 (2009). The party seeking prejudgment interest bears the burden of proof on these issues. *Precision Seed Cleaners v. Country Mut. Ins. Co.*, 976 F.Supp.2d 1228, 1257 (D. Or. 2013).

Here, both Plaintiffs and Defendants request prejudgment interest on their claimed losses. Neither provide legal authority or argumentation in support of, or opposition to, these requests. The parties' lacking presentations on this subject hinders the court's ability to determine whether and when their precise losses were readily ascertainable. Accordingly, as detailed below, I find that it would not be proper to award prejudgment interest on any of the parties' claims.

I cannot confidently pinpoint the precise dates on which some of the claimed losses became due. There is no obvious date when Defendants became obligated to reimburse Plaintiffs for their accidental overpayment of two invoices. Defendants' invoices for the Falcon management fees say payments were "due on receipt" but there is no evidence of when, if ever,

Plaintiffs received them. Pls.' Ex. 16. Without this temporal information, I cannot calculate the amount of interest owed on these claims.

The amounts owed on other claims were not ascertained until trial. The parties disputed certain items in Defendants' Bonanza invoices. There was confusion over whether Plaintiffs had already reimbursed Defendant for the Falcon's fuel. It is well settled under Oregon law that "the fact that the amount owed cannot be ascertained without resolving complex issues of fact does not bar a determination that the defendant owed sums certain at a date certain." *Jones v. Dorsey*, 193 Or.App. 688, 692-93 (2004). Objectively, it was well "within the ability of the parties to ascertain the [actual] amount of compensation owed." *Miller v. C.C. Meisel Co.*, 183 Or.App. 148, 182 (2002). However, the evidence indicates that Defendants were not responsive to Plaintiffs' efforts to do so. I find that it would be inappropriate to award interest to Defendants on these claims given Defendants' role in delaying their resolution. *See Jones*, 193 Or.App. at 693 (noting the inverse, an award is especially appropriate where the non-claimant caused the complexity in ascertaining the amount owed).

Similarly, though the Falcon agreement obligated Defendants to refund Plaintiffs' deposit upon termination of the agreement, the evidence before the court is that Sutton believed that debt had already been paid and Plaintiffs never followed up to demand it. I find that an award of prejudgment interest on a payment that was not requested or even identified as overdue would not be consistent with the prejudgment interest statute's underlying goals of compensation and fairness.

## CONCLUSION

For these reasons, I find:

1. Plaintiffs' conversion claim is moot.

2. In favor of Defendants on Plaintiffs' negligence claim.

3. In favor of Defendants on Plaintiffs' breach of contract claim related to the Cirrus crash.

4. In Plaintiffs' favor in the amount of $50,000 for the return of their deposit.

5. In favor of Defendants on Plaintiffs' claim for the Falcon's reduction in sale price.

6. In Plaintiffs' favor in the amount of $29,061.45 to correct their double payment of two invoices.

7. In Defendants' favor in the amount of $36,712.48 for their counterclaim related to the Bonanza.

8. In Defendants' favor in the amount of $7,129.75 for travel expenses related to the Falcon and $222,000 for unpaid management fees.

It is so ORDERED and DATED this __14__ day of October 2015.

MARK D. CLARKE
United States Magistrate Judge